**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,            ) | |
|                                      ) | |
|            Plaintiff,                ) | Case No. 2:08-cr-00134-PMP-PAL |
|                                      ) | |
| vs.                                  ) | **REPORT OF** |
|                                      ) | **FINDINGS AND RECOMMENDATION** |
| ALEXANDER MERCADO,                   ) | |
|                                      ) | (M/Suppress - Dkt. #69) |
|            Defendant.                ) | |
|                                      ) | |

   Before the court is defendant Alexander Mercado's Motion to Suppress (Dkt. #69) which was referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. The court conducted an evidentiary hearing on February 13, 2009. The court has considered the motion, the Government's Response (Dkt. #78), Mercado's Reply (Dkt. #78), and the evidence adduced and arguments of counsel at the evidentiary hearing. The court has also considered the Government's Response to Defendant's Reply to Government's Response to Motion to Suppress Evidence") (Dkt. #84). Although surreplies are not ordinarily permitted, Mercado's reply raised additional arguments not raised in his initial motion.

**BACKGROUND**

   On May 13, 2008, the grand jury returned a two-count Indictment (Dkt. #25) against Alexander Mercado ("Mercado"), charging him with conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A)(ii), and possession of cocaine with intent to distribute. Mercado was arrested on April 27, 2008 during a narcotics investigation conducted by the North Las Vegas Police Department ("NLVPD"). Mercado was a passenger in a black VW Passat pulled over for speeding on Interstate 15 near Jean, Nevada. The driver, co-defendant Javier Reyes ("Reyes"), signed a

/ / /

written consent to search the vehicle. A search of the vehicle recovered approximately 6.6 pounds of cocaine and $10,000 in cash.

## DISCUSSION

### I. The Parties' Arguments

#### A. Mercado's Motion to Suppress

Mercado's initial written motion to suppress argued there was insufficient evidence that Mercado possessed the drugs found inside the vehicle and argued Mercado could not be convicted on the basis of the evidence revealed in the discovery produced by the government. His initial motion argued he lacked knowledge that the narcotics were in the vehicle and never exercised dominion or control over them.

#### B. The Government's Response

The government opposes the motion to suppress and requested that the court vacate a scheduled evidentiary hearing because Mercado: (1) failed to raise any contested issues of material fact which would support suppression; (2) may not challenge the sufficiency of the evidence in a motion to suppress; and (3) lacked standing to challenge a search of the car.

#### C. Mercado's Reply

The reply clarifies that Mercado's motion to suppress challenges the stop of the vehicle on Fourth Amendment grounds and that Mercado is challenging the lawfulness of his detention as a passenger in the vehicle. He argues that the vehicle was not speeding and that the officers conducted a pretextual stop to conduct an illegal search. He also argues that he was unlawfully detained and that the evidence recovered from the vehicle was in some sense the product of his unlawful detention. He asserts that he was unlawfully detained because he was only a passenger in the vehicle who had not committed any illegal activity, and the officers did not issue the driver a citation for speeding and allow the occupants of the vehicle to leave the scene. He contends that even if the vehicle was speeding, the officers should have issued the driver a citation for speeding and allowed the occupants to leave. Because they did not do so, Mercado was unlawfully detained, and the evidence recovered during the search of the vehicle should be suppressed.

/ / /

### D. The Government's Surreply

The surreply responds to arguments Mercado raised in the reply for the first time. The government asserts that the co-defendant's vehicle was lawfully stopped for speeding and that based on the investigation conducted prior to the traffic stop and information developed during the course of the traffic stop, the officers developed reasonable suspicion to believe Reyes and Mercado were transporting drugs. Although the government's position is that Reyes voluntarily consented to a search of the vehicle, the government claims his consent was not required because the officers developed probable cause during the traffic stop of the vehicle to search it for drugs. After an initial quantity of drugs was found in a hidden compartment in the Passat, a search warrant was obtained, and a more thorough search of the vehicle was conducted.

## II. Evidence Before the Court

The court conducted a telephonic status conference with counsel for Mercado and counsel for the government on January 15, 2009 to clarify the scope of the evidentiary hearing that would be conducted. With respect to Mercado, the court indicated a testimony would be taken to address Mercado's claims his Fourth Amendment rights were violated by the traffic stop but would not address his insufficiency of the evidence arguments.

### A. Testimony of Sergeant George Middlebrook

Middlebrook has been employed as a sergeant in the narcotics unit of the North Las Vegas Police Department ("NLVPD") for approximately four years and is part of a DEA drug task force. In April 2008, he was involved in an investigation concerning Javier Reyes, a co-defendant in this case. Middlebrook obtained a Title III wiretap on Reyes' phone which was in place for approximately one week. There were a number of intercepted telephone conversations in English concerning narcotics and drug sales. Much of the conversation was in "coded language" which, based on Middlebrook's experience, is typical for calls concerning the sale and trafficking of drugs.

There were a number of phone calls between Reyes and a person identified as "Chuckie," later identified as Mercado, which discussed "Chuckie" coordinating a meeting with his uncle. One of the calls that was intercepted was a call between Reyes and co-defendant Alexander Mercado which discussed making a trip to California on Saturday, April 26, 2008, to meet up with Mercado's uncle

who was, in turn, going to put them in touch with someone from whom they could buy drugs. Coded language was used which referred to a "nice table" and a numeric reference to "two to four." Based on his training and experience, Middlebrook believed Mercado and Reyes were discussing buying several kilos of cocaine.

Based on these intercepted phone calls, Middlebrook and his unit set up surveillance on Reyes' home at 6250 Maxwood Court in Las Vegas, Nevada, early in the morning on April 26, 2008. Reyes was observed leaving his home at approximately 9:44 a.m., getting into an unregistered silver Ford Focus, and going to a residence at 907 Carnival in Las Vegas, Nevada. Investigators subsequently learned co-defendant Uriarte lived at the Carnival address. Reyes backed out a vehicle from the garage of the Carnival address and then left in a Ford Focus where he was surveilled to a gas station. At the gas station, Reyes met up with two unidentified Hispanic men who were in a Volkswagen Passat. Both cars left the gas station and drove to Reyes' home on Maxwood. Just before Reyes got back to his home, officers observed Mercado arriving at the Maxwood address. Reyes pulled the Passat into the garage and closed the garage door. A short time later, Mercado and Reyes got into the Passat, and the two Hispanic males got into the Ford Focus and drove away. The Passat with Mercado and Reyes in it drove to another gas station where they met up with Manny Razo, a known, high-level drug trafficker. The week prior, law enforcement intercepted a phone call between Razo and Reyes in which Razo was to give Reyes $2,000 to use on the trip to California to buy drugs. Reyes and Mercado then went to another gas station where Reyes opened up the trunk. Surveillance was unable to determine what they were doing. Reyes and Mercado went back to the Carnival address. At the Carnival address, Reyes got into the driver's side of the Passat, Mercado got into the passenger's side, the two unidentified Hispanic males got into the back, and all four men left and headed to California. Surveillance officers followed.

Middlebrook contacted Rowland Acevedo of the Riverside County Sheriff's Office to pick up surveillance of the Passat when it entered California. Detective Acevedo's unit picked up surveillance of the Passat at the Summit Avenue exit in Rancho Cucamonga. Middlebrook was in telephonic contact with Acevedo and provided the license plate and a description of the Passat and its occupants. The Passat was surveilled to an address at 15068 Barwood in La Mirada, California, where the two rear passengers of the vehicle got out and went into the house. One of the two Hispanic male passengers

who got out of the Passat was subsequently identified based on surveillance and photographs as co-defendant Uriarte.

Reyes and Mercado then drove to a strip mall in Lenox, California, where they met up with two unidentified Hispanic males in another vehicle. Reyes and Mercado followed the vehicle to a residence at 6502 Vinevale Avenue in Bell, California, where a party was occurring. Reyes, Mercado, and the other two men went into the house on Vinevale. A short time later, Reyes left the home, went to the Passat, removed a black duffel bag from the trunk, and reentered the home. A short time later, all four men left the house. Reyes and one of the unidentified Hispanic males got inside the Passat. Mercado and another Hispanic male got inside a white van. Surveillance followed the vehicles to a residence at 8160 Cyprus Avenue in Southgate, California, where Reyes was observed parking the Passat in the garage and shutting the door. Approximately an hour or two later, Reyes and Mercado left the residence in the Passat and drove to the El Pesquador Restaurant where Middlebrook's unit resumed surveillance. From there, Reyes and Mercado were surveilled returning to Las Vegas on Interstate 15.

Middlebrook decided that the vehicle Reyes and Mercado were in would be stopped because based on the investigation, officers believed drugs were in the car. Middlebrook called the on-duty North Las Vegas sergeant and requested an on-duty patrol unit and a K-9 unit to come out to Jean, Nevada, to assist in the stop. The Passat was stopped for speeding. Middlebrook understood that the driver of the vehicle gave consent to a search of the vehicle. The K-9 alerted, and three kilos of cocaine were discovered in a hidden compartment under the rear seat. Middlebrook subsequently assisted in a further search of the Passat pursuant to a state search warrant.

On cross examination, Middlebrook acknowledged that he did not see Mercado with any drugs and did not hear Mercado use the word "drug" during their surveillance. None of the officers saw any drugs until after the traffic stop. During the surveillance, neither Mercado nor co-defendant Reyes were observed doing anything illegal except speeding. Middlebrook called NLVPD to conduct a traffic stop and told the patrol officer to stop the vehicle when he had probable cause. However, based on the investigation and observations made during surveillance, the vehicle would have been stopped in any event. He and other undercover officers were not involved in the stop of the vehicle because they use marked patrol units to conduct traffic stops. Officers were aware Mercado had a CCW [concealed

1  weapons] permit, and officers wanted to use a marked patrol unit for officer safety. Generally,
2  unmarked surveillance vehicles do not pull suspects over for a variety of reasons. Undercover officers
3  do not want to be identified as law enforcement officers or have their vehicles identified because it may
4  damage their investigation. Also, there are officer safety concerns for using marked patrol units which
5  are readily identified as police officers and have the appropriate gear to conduct traffic stops.
6  Undercover officers often do not have their police identification readily on hand or have the proper gear
7  to conduct a traffic stop, such as a bullet resistant vest or gun belt.

8        Middlebrook acknowledged that once the vehicle was pulled over, it was going to be searched.
9  That was the intent of initiating the stop. Middlebrook was not involved in the stop and was stopped
10 some distance away. However, there were phone calls back and forth among the officers involved in
11 the stop and undercover officers. Middlebrook understood that officers at the scene got consent to
12 search the vehicle and that there was a written consent to search. Middlebrook also understood that
13 Officer Nellis, the K-9 unit, was called for, and the drug dog was deployed. Middlebrook estimated
14 that the duration of the traffic stop was within thirty to forty-five minutes.

15       **B.**    **Testimony of Officer John Cargile**

16       Officer Cargile has been employed by NLVPD for approximately eight and a half years and is
17 currently a field training officer. He was on duty on April 27, 2008 in the early morning hours when he
18 received a phone call from his sergeant that a narcotics unit needed assistance in a traffic stop. He was
19 advised to make contact with narcotics Sergeant Middlebrook and told by Investigator Gomez that the
20 vehicle was to be stopped on the freeway at Jean. The vehicle he was to stop was described as a dark
21 VW Passat with California license plates which were provided. He was told the vehicle had two
22 occupants, that it was involved in a narcotics investigation, and it was suspected that narcotics were in
23 the car. He has conducted stops for narcotics units in the past, and it is "pretty much known I need my
24 own probable cause to make the traffic stop," most likely observation of a traffic violation. He was
25 notified that one of the occupants may have a concealed weapons permit, but it was not known whether
26 he was armed.

27       Cargile drove to the Jean, Nevada, exit on I-15 and waited for the Passat on the entrance ramp to
28 the highway. He maintained cell phone contact with Investigator Gomez. Around 12:48 a.m., Cargile

saw the Passat with the license plate described drive by. Cargile had a trainee in the car who was there to observe and to provide backup. Cargile got behind the Passat traveling northbound on I-15 and paced it for approximately a quarter mile to approximately mile marker 15. Traffic that night was very light, although there were other vehicles on the road. He was approximately thirty to forty feet behind the Passat. He did not have a radar unit and paced the Passat by maintaining a distance of thirty to forty feet, maintaining the same distance for a short period of time while pacing the vehicle. He checked his speedometer and determined that the vehicle was traveling eighty-two miles per hour in a posted seventy mile per hour zone. Cargile was not aware when his speedometer was last calibrated but testified the patrol vehicle undergoes monthly maintenance checks and had no maintenance problems. Cargile pulled the Passat over just north of mile marker 15. Cargile approached the driver side, and the trainee approached the passenger side.

The driver identified himself verbally and then provided a driver's license. Cargile told Reyes why he was being stopped and asked for his driver's license, insurance card, and registration. Reyes did not comment when Cargile told him the reason for the stop. Reyes provided Cargile with a driver's license and insurance card but did not provide a vehicle registration. The insurance card had no vehicle information on it which is unusual. Most of the time, a vehicle description and VIN number are on an insurance card. Reyes said that was the insurance card he was provided. He also stated that he had just purchased the vehicle at auction and did not have a registration card.

Cargile asked Mercado about his travel which is routinely done in a traffic stop. Cargile noticed the plates on the vehicle were from California, and Mercado stated he had been traveling in California. Cargile asked where in California, and Mercado responded that he had been driving "all around." Reyes said he was from Glendale, California, and had been in the Los Angeles area but was unable to state where he had been driving. Cargile found this suspicious because he claimed to be a California native. Reyes said he had just purchased the car at auction in Las Vegas. Cargile then asked him why the car had California license plates on it, and Reyes said he did not know. After obtaining this initial information, Cargile went back to his patrol vehicle to run a records check.

After calling in the records check, a K-9 unit, Officer Nellis and his dog, arrived to assist. Officer Nellis drove up to the patrol car, and Cargile explained that he had conducted a traffic stop and

1  what he had learned so far.  Officer Nellis and his dog remained in the vehicle initially.  The records
2  check revealed Reyes driver's license was suspended, and the vehicle was registered to an Antonio
3  Roman in Huntington, California.  Reyes' driver's license was suspended for failure to maintain
4  financial responsibility.
5      After receiving the records check report, Cargile approached Reyes and asked him to get out of
6  the vehicle and step toward the patrol car.  Reyes complied, and Cargile approached the passenger side
7  to speak with the passenger.  Before speaking with the passenger, Cargile told Reyes he was asked to
8  step out because his driver's license had been suspended, and he was not the registered owner of the
9  vehicle.  Reyes was fairly nervous and did not make a lot of eye contact but was answering all of
10 Cargile's questions.
11     Cargile spoke to the passenger who identified himself as Alexander Mercado and provided
12 photo identification.  Cargile asked Mercado where they were coming from.  Mercado said they had
13 come from California.  Cargile asked where in California, and Mercado responded he did not really
14 know.  Cargile asked whether it was from northern California or southern California, and Mercado
15 responded they had come from southern California near San Diego.  Mercado said he was from
16 Inglewood, California.  Cargile found it odd that a native Californian could not say where he had
17 traveled from in California.  Mercado was fairly calm but did not make a lot of eye contact.  Mercado
18 was able to clearly answer Cargile's questions.  Cargile was suspicious because Reyes and Mercado
19 gave different accounts of where they had been, and both claimed to be California natives but did not
20 know where in California they had been.  At this point, Cargile asked Mercado to step out of the car.
21 Mercado complied and walked to the rear of Cargile's patrol vehicle.
22     Cargile told Reyes that he had received inconsistent stories concerning where they had come
23 from and asked whether he could search the vehicle for drugs and weapons.  Reyes said "go ahead."
24 Cargile reiterated that he was going to be looking for drugs and weapons.  Cargile indicated he wanted
25 to use a K-9 to search the vehicle, and Reyes gave verbal consent.  After receiving verbal consent,
26 Cargile went back to his patrol vehicle where he retrieved and filled out a written consent to search
27 form.  He filled out the form on the hood of the vehicle, explained the form to Reyes, and indicated it
28 gave permission to use Officer Nellis and his drug dog to search.  Cargile filled out the portion of the

form which identified the vehicle, that he would be conducting the search, and that Officer Nellis and his dog would also be conducting the search. Reyes appeared to read the form, said he understood it, and signed it. A portion of the form indicated Reyes was giving permission to search areas of the car that need to be accessed with tools. The form was signed at approximately 1:00 a.m., about twelve minutes after the initial traffic stop. The consent to search form Reyes signed was marked and admitted as Government's Exhibit "1." Reyes was not in handcuffs at the time he signed the consent to search form, had not been advised of his *Miranda* rights, and was not in custody. None of the officers had their guns drawn. There were three officers at the scene at the time the consent was obtained.

After Reyes signed the consent to search form, Officer Nellis and his dog got out of the vehicle and approached the trunk area of the Passat. As the dog approached the trunk, Reyes told Cargile that he had $10,000 in cash in the trunk in a black duffle bag. The dog alerted to the trunk and interior of the car. Cargile did a hand search and initially opened the trunk of the vehicle. When the trunk was opened, the dog alerted on the cash that was in the vehicle. The dog also alerted to the undercarriage of the vehicle. Cargile looked underneath the vehicle on the driver's side and saw a compartment and a bag wrapped in black tape and cellophane, consistent with the way narcotics are packaged. After the hidden compartment and bag were discovered, Reyes and Mercado were placed under arrest. A state search warrant was subsequently obtained to conduct a more thorough search of the vehicle. Cargile sealed the vehicle with tape, and it was towed to the North Las Vegas police station. He spoke with Investigator Skipworth who was going to apply for a telephonic search warrant and provided information about the stop. Cargile followed the car to the police station. Cargile did not participate in the subsequent search of the vehicle. He remained with the two suspects.

Cargile testified that Reyes did not revoke consent to search at any time, although he was standing fifteen to twenty feet away and was close enough to do so.

On cross examination, Cargile testified that he went out to Jean with the intention of locating the vehicle described and to attempt to develop probable cause to stop it. Cargile did not know whether Officer Nellis was also dispatched to assist in the stop but was aware that he was out there. Cargile knew Officer Nellis was out in the area. Cargile observed Nellis' vehicle near the Jean off ramp, but they were not parked next to each other. Nellis was there for backup because Cargile had a trainee in

his patrol car. He estimated it was half an hour at the most from the time of the stop to the time of the arrest.

### C. Testimony of Officer Gary Nellis

Officer Nellis has been employed by NLVPD for eight and a half years and, prior to that, was a state parole and probation officer. He is currently assigned as a canine handler and has been since July 2004. He went through a five-week course with the LVMPD with his first dog and spent approximately two hundred hours in training. When he got his current dog, Mack, he went through another two hundred hour five-week course. Mack is a narcotics detection dog. Mack is trained to detect the odors of marijuana, methamphetamine, cocaine, and heroin. Mack was originally certified May 18, 2005 and has been certified by the California Canine Association twice, most recently in October 2008. The national average requires certifying narcotics dogs in those four odors once a year. However, Nellis' requirements with NLVPD is to require four certifications in all four odors a year. Mack's last certification was December 10, 2008. Mack has passed every certification he has attempted. Mack has approximately four hundred hours in field training and has an accuracy rate of 98.5 percent in "field finds." As a handler, Nellis is trained to detect changes in Mack's behavior which indicate the dog has detected an odor he is trained on. When Mack alerts on one of these odors, he exhibits a behavior change called "bracketing," laterally walking back and forth in the area of the odor.

Nellis was on duty with Mack on April 27, 2008 in the early morning hours. He received a call from Sergeant Middlebrook who said the narcotics unit was conducting a surveillance and following a vehicle which was expected to come from California and expected to have multiple kilos of cocaine. Middlebrook told Nellis that Officer Cargile was going to be doing a traffic stop on the vehicle. The black VW Passat was eventually stopped on I-15 near mile marker 15. When Nellis pulled up, Officer Cargile and his trainee were up with the stopped vehicle. Nellis stayed in his vehicle for a few seconds, and as he was getting out of his patrol vehicle, Cargile was getting the driver out of the Passat. Nellis approached Cargile's patrol vehicle but was too far away to hear the conversation Cargile was having initially with the driver and then the passenger. Officer Cargile got verbal consent to search the vehicle. When Cargile got the written form and started to fill it out, Nellis went back to his vehicle and got his dog. When Cargile said the consent was signed, Nellis started a search from the rear of the vehicle.

1   Mack was on a leash and began bracketing laterally left to right in the trunk area of the vehicle. This
2   indicated Mack was "in odor," *i.e.*, he was noting one of the four substances he is trained to detect.
3   Nellis let the dog do his job. Mack went to the passenger side of the vehicle where the window was
4   rolled down and bracketed back and forth before jumping inside the car. As his handler, this indicated
5   that Mack was "in narcotics odor." Inside the vehicle, Mack alerted in the area of the center console
6   toward the rear seat. Nellis took Mack out of the vehicle and took him to the rear and popped the trunk.
7   Mack jumped in and alerted to a black duffle bag. Nellis got the dog out of the trunk and laid him
8   down. Nellis looked inside the black duffle bag and found U.S. currency wrapped in green cellophane.
9   he redeployed his dog who alerted on the green cellophane. The driver of the car was standing at the
10  front of Cargile's patrol vehicle. Nellis asked Reyes what he was doing with the cash, and Reyes
11  responded that he was going to purchase a vehicle. Nellis asked Reyes whether there was anything
12  illegal in the car, and Reyes responded there was not. Nellis asked followup questions, specifically
13  about whether there were any drugs in the car. Reyes responded with words to the effect that there were
14  not, and that is why he gave permission to search the car.

15         Nellis put Mack back in his unmarked patrol car and conducted a hand search of the Passat in
16  the center console area but did not find anything. He noticed that the carpet in the passenger rear side
17  was glued down and was aware based on his training and experience that this was not a factory
18  installation, indicating the vehicle had been modified. This is an indicator he is trained to look for in
19  narcotics interdiction. He popped open the rear seat to look for a hidden compartment and observed
20  more carpet glued down. This caused him to look underneath the car where he saw a heat shield which
21  was extremely dirty and did not look right. It looked like it had been replaced because several of the
22  bolts were missing. He went around to the other side and saw that some of the bolts were clean and
23  new looking. There was a piece of the undercarriage that was bent down. Nellis pulled it the rest of the
24  way and saw a cutout in the chassis of the vehicle which should not have been there. The heat shield
25  was keeping whatever was in the cutout from coming out. Nellis saw two rectangular objects that
26  looked to be covered in black electrical tape which he knew based on his training and experience and
27  Mack's alerts were drugs. Nellis got his dog, and he alerted in the area where the packages were
28  observed.

11

1    Nellis informed Sergeant Middlebrook and Investigator Skipworth of what he saw, and a state
2    search warrant was obtained. He and Officer Cargile sealed the vehicle with evidence tape. Nellis and
3    Cargile followed the tow truck back into town to the south area command where they got the warrant
4    for the search. The driver of the vehicle did not revoke consent to search at any time.

5    On cross examination, Nellis testified that he was at home when he received the call that he was
6    wanted out at Jean because officers expected to find multiple kilos of cocaine in a vehicle. The
7    narcotics officers wanted him out there to have the dog sniff if they got the car stopped. He got to Jean,
8    Nevada, and waited for approximately half an hour. He spoke with Officer Cargile who was setting up
9    on the on ramp to go northbound on I-15. When Cargile said that is where he was going to be, Nellis
10   pulled up behind Cargile's vehicle and waited. Nellis parked his unmarked Ford Expedition five to ten
11   feet behind Cargile's vehicle. Cargile and Nellis were sitting on the northbound ramp for ten to fifteen
12   minutes before the car came by. Traffic was light. Cargile pursued the vehicle while Nellis remained
13   on the on ramp. Cargile called out the stop at mile marker 15. Nellis waited a couple more minutes
14   after Cargile called out the stop before he went to the scene. Nellis estimated that it was a good thirty to
15   thirty-five minutes between the time he arrived at the scene and the time he observed the narcotics
16   under the vehicle. The cutouts he observed underneath the vehicle were directly beneath where the
17   glued down carpet was.

18   **D.    Testimony of Javier Reyes**

19   Co-defendant Javier Reyes testified and was accompanied by his lawyer, Michael Cristalli. Mr.
20   Cristalli advised the court that Reyes had been convicted and sentenced in this case and was awaiting
21   designation to a Bureau of Prisons facility. Mr. Cristalli agreed to appear with him to provide advice if
22   needed. Reyes testified that at about 12:45 a.m. on April 27, 2008, he was driving on Interstate 15 near
23   Jean, Nevada. He believed he was driving approximately sixty-five miles per hour. He saw the police
24   officer a few cars back and looked at his speedometer to see he was going sixty-five miles per hour.
25   When asked whether he had his cruise control on, he testified he believed so and that it was set for
26   sixty-five miles per hour. On cross-examination, he admitted that the Passat was not his and that he had
27   never driven it before. He did not know whether the speedometer had ever been calibrated or whether
28   the car still had factory tires on it. When he saw the patrol vehicle, he thought he was going to be

1  pulled over, and his adrenalin was pumping.  However, he maintained the same speed.  On redirect
2  examination, Reyes testified that there was "a lot" of traffic on the road that night and that other
3  vehicles were passing him before he was stopped.

## DISCUSSION

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. Katz v. United States, 389 U.S. 347 (1967). The Fourth Amendment protects "people not places." Id. Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471 (1963).

### A. Capacity to Claim Protection of the Fourth Amendment

Because the Fourth Amendment protects people not places, the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Minnesota v. Olson, 495 U.S. 91, 95 (1990) (citing Katz v. United States, 389 U.S. 347 (1967)); Rakas v. Illinois, 439 U.S. 128, 143 (1978). In order to have "standing" or "capacity" to contest the legality of a search or seizure, a defendant must establish that he had a subjective expectation of privacy in the place searched, an expectation society accepts as objectively reasonable. Minnesota v. Carter, 525 U.S. 83, 87-88 (1998) (citing Rakas, 439 U.S. at 143-44 & n.12). The defendant bears the burden of establishing, under the totality of the circumstances, that "the search or seizure violated his legitimate expectation of privacy in a particular place." United States v. Davis, 932 F.2d 752, 756 (9th Cir. 1991) (citing Rawlings v. Kentucky, 448 U.S. 98, 104 (1980)). The defendant has the burden of establishing standing, or capacity to claim the protection of the Fourth Amendment. United States v. Dorais, 241 F.3d 1124, 1130 (9th Cir. 2001); see also United States v. Singleton, 987 F.2d 1444, 1449 (9th Cir. 1993).

The Ninth Circuit has held that "[a] person seeking to exclude evidence allegedly obtained in violation of the fourth amendment must have standing to challenge the illegal conduct that lead to the discovery of the evidence." United States v. Pulliam, 405 F.3d 782, 786 (9th Cir. 2005) (citing Rakas v. Illinois, 439 U.S. 128, 134 (1978)). Fourth Amendment rights are personal rights which may not be

vicariously asserted. Rakas, 439 U.S. at 133-34. In Rakas, the Supreme Court held that "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by the search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Id. at 134. Thus, Mercado must show that his reasonable expectation to privacy was infringed to challenge this search and seizure.

Applying these principles to this case, Mercado does not claim he had any possessory interest in the car Reyes was driving. As a passenger with no possessory interest in the car Reyes was driving, he had no reasonable expectation of privacy sufficient to permit him to challenge the search of the car on Fourth Amendment grounds. However, Mercado does have standing to contest the legality of his own detention. Id. Thus, although Mercado lacks capacity to directly challenge a search of the VW Passat Reyes was driving, he may nevertheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of his own unlawful detention. Id. To be entitled to suppression of the evidence recovered from the car, Mercado must show that the evidence was "in some sense the product" of his own wrongful detention. Id., citing Segura v. United States, 468 U.S. 796, 815.

### B.   The Traffic Stop

Mercado argues the initial stop of the vehicle was unlawful because it was not based on reasonable suspicion or probable cause and that everything derived from the search must, therefore, be suppressed under the "fruit of the poisonous tree" doctrine. Mercado claims Reyes was not speeding and that the traffic stop was pretextual. The government responds that the traffic stop was based on probable cause to believe Reyes was speeding and, in addition, the collective knowledge of the law enforcement officers conducting the narcotics investigation amounted to reasonable suspicion to stop the car to investigate drug trafficking.

A traffic stop is a seizure for purposes of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979). A decision to stop an automobile is reasonable where the police have probable cause to believe a traffic violation has occurred. Whren v. United States, 517 U.S. 806, 810 (1996). As long as the officers had probable cause to conduct a stop for a traffic violation, the fact that the occupants of the vehicle may also be suspected of transporting drugs does not render the stop

invalid for Fourth Amendment purposes. This is because the United States Supreme Court has made it clear that "[s]ubjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis." Id. at 813. Or, as the Ninth Circuit described Whren's holding, "Whren stands for the proposition that if the officers have probable cause to believe that a traffic violation occurred, the officers may conduct a traffic stop even if the stop serves some other purpose." United States v. Willis, 431 F.3d 709, 715 (9th Cir. 2005).

Cargile testified he pulled the VW Passat over for speeding eighty-two miles per hour in a posted seventy mile per hour zone after pacing the Passat's speed for a distance of approximately one quarter of a mile. Reyes testified that he believed he was traveling sixty-five miles per hour – five miles under the posted speed limit. When prompted on direct examination, he also testified he "believed" he was using cruise control. Reyes testified that there was a lot of traffic on Interstate 15 near Jean at the time of the stop and that a number of vehicles had passed him before he was pulled over. However, both Cargile and Nellis testified traffic was light. The court believed Officer Cargile that he paced the VW Passat traveling eighty-two miles per hour in a posted seventy mile per hour zone in light traffic over Reyes' testimony he was traveling five miles per hour under the speed limit in heavy traffic. The court finds the initial traffic stop was based on probable cause and, therefore, reasonable within the meaning of the Fourth Amendment.

A passenger in a vehicle pulled over in a traffic stop is seized for purposes of the Fourth Amendment and, therefore, may challenge the constitutionality of the stop. Brendlin v. California, 551 U.S. 249, 255, 127 Supreme Court 2400, 2403 (2007). Mercado appears to argue that he was detained during the traffic stop with the driver longer than necessary and should have been allowed to leave. The Supreme Court has held that police contact during an investigatory detention must be reasonably related to the circumstances that initially justified the detention. United States v. Sharpe, 470 U.S. 675, 682 (1985). "The length and scope of detention must be justified by the circumstances authorizing its initiation." Pierce v. Multnomah County, 76 F.3d 1032, 1038 (9th Cir. 1996), citing Terry v. Ohio, 392 U.S. 1, 16 (1968). See also Illinois v. Caballes, 543 U.S. 405, 408 (2005) ("A seizure that is lawful in its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interest protected by the Constitution.") "Thus, when an officer has obtained

sufficient information to issue a citation, a continued detention without probable cause to arrest for a crime is unreasonable." Id., citing United States v. Luckett, 484 F.2d 89, 90-91 (9th Cir. 1973) (*per curiam*).

The court finds this traffic stop lasted no longer than necessary to perform the traditional incidents of a routine traffic stop. Cargile approached the driver and informed him of the reason for the stop before asking for his driver's license, registration, and insurance information. Reyes did not have a vehicle registration and told Cargile that he had just purchased the vehicle in an auction in Las Vegas. Cargile asked why the car had California license plates and asked Reyes where he had come from. After obtaining this preliminary information, Cargile went to his patrol vehicle to run a records check. The records check revealed that Reyes was driving on a suspended driver's license and was not the registered owner of the vehicle. Cargile went back to the Passat and asked Reyes to get out of the vehicle and step toward the patrol car. Cargile then spoke to Mercado and asked for his identification and where he had been traveling. When Cargile received inconsistent information from Reyes and Mercado concerning their travel, he told this to Reyes and requested permission to search the vehicle for drugs and weapons. It is undisputed the entire encounter from the point of the initial traffic stop until Reyes signed the consent to search form lasted twelve minutes. The court finds the scope and duration of the initial traffic stop did not violate Mercado's Fourth Amendment rights.

The Supreme Court recently reiterated that most traffic stops "resemble, in duration and atmosphere, the kind of brief detention authorized in Terry." Arizona v. Johnston, 555 U.S. ___, 129 S. Ct. 781, 786 (2009) (citing Berkemer v. McCarty, 468 U.S. 420, 439, n. 29 (1984). In Johnson, the Supreme Court held that "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation," the police do not need "to believe any occupant of the vehicle is involved in criminal activity." Id. at 784. The Johnston decision traced the development of its cases applying *Terry* investigatory detentions to automobile stops and the application of those cases to passengers in vehicles. As the Supreme Court explained:

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to

>   leave. (citation omitted) An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. See Muehler v. Mena, 544 U.S. 93, 100-101 (2005).

Id. at 788.

In Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977) (*per curiam*), the Supreme Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." The Mimms rule was extended to passengers in Maryland v. Wilson, 519 U.S. 408, 415 (1997), when the Supreme Court held that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." In short, although Mercado was clearly seized from the moment the car was pulled over and has standing to challenge the constitutionality of his own detention, the initial stop was based on probable cause, and the scope and duration of the detention were objectively reasonable and did not violate his Fourth Amendment rights.

Additionally, the court concludes that at the time the Passat was stopped for speeding, the police collectively had at least reasonable suspicion to believe that the vehicle and its occupants had been engaged in a drug transaction and were, therefore, justified in conducting an investigatory detention. At the time the vehicle was pulled over, the police had a particularized and objective basis for suspecting the occupants of the VW Passat had been engaged in criminal activity. The Fourth Amendment requires reasonable suspicion, not probable cause, to conduct a traffic stop. United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000). Reasonable suspicion "requires specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." United States v. Thomas, 211 F.3d 1186, 1189 (9th Cir. 2000). *Terry*'s "reasonable suspicion" standard is "less demanding . . . than probable cause." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). The quantum of proof necessary to demonstrate reasonable suspicion is "considerably less than a preponderance of the evidence." Id.

In determining whether reasonable suspicion exists, courts look to the totality of the circumstances of each case to see whether a detaining officer has a particularized and objective basis for suspecting legal wrongdoing. United States v. Arvizu, 534 U.S. 266, 273 (2002). Investigating officers

are entitled to draw on their training and experience "to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Id. In Arvizu, the Supreme Court again reiterated that "the concept of reasonable suspicion is somewhat abstract" and that observation of factors which are by themselves consistent with innocense may collectively amount to reasonable suspicion. Id.

The VW Passat Reyes and Mercado were traveling in was pulled over at approximately 12:48 a.m. on April 27, 2008, after a twelve-hour round trip from Las Vegas to California and back. Reyes, Mercado, and two other Hispanic males were observed leaving Reyes' residence in Las Vegas at 9:44 a.m. in the Passat. Reyes and Mercado had been overheard in intercepted wiretaps days before, discussing making a trip to California on April 26, 2008 to buy kilos of cocaine. Reyes was overheard speaking with a known drug dealer, Manny Razo, who was to provide Reyes with $2,000 to purchase drugs. During surveillance conducted before Reyes and Mercado left Las Vegas, Reyes and Mercado drove to a gas station where they met up with Razo. The Passat was surveilled to California where the occupants made multiple stops at different locations, entering and leaving after relatively short periods of time. Reyes was observed removing the black duffle bag recovered from the search of the Passat from his trunk and entering the home on Vinevale Avenue in Bell, California, and then surveilled to Southgate, California, where he parked the Passat in the garage and closed the door before emerging an hour or two later and driving to a restaurant. From the restaurant, they were surveilled returning to Las Vegas on Interstate 15 and stopped near Jean, Nevada.

Under all these circumstances, the court concludes that the cumulative information available to these experienced narcotics officers amounted to reasonable suspicion that the occupants of the Passat had been engaged in criminal activity. As a general rule, "where law enforcement authorities are cooperating in an investigation . . . the knowledge of one is presumed shared by all." Illinois v. Andreas, 463 U.S. 765, 772 n.5 (1983). See also United States v. Jensen, 425 F.3d 698, 705 (9th Cir. 2005) (explaining the collective knowledge doctrine is an accepted practice of modern law enforcement which exists in light of the complexity of modern police work and allows an arresting officer who lacks actual personal knowledge of facts supporting probable cause to rely on the collective knowledge of law enforcement personnel cooperating in an investigation). Although many of the observations made

during surveillance individually were "quite consistent with innocent travel" based on the information collectively available to the investigating officers, especially in the context of the intercepted communications, they amounted to reasonable suspicion.

### C. Consent

It is undisputed that within twelve minutes of the initial traffic stop, co-defendant Javier Reyes, the driver of the VW Passat, gave verbal and written consent to search the vehicle. "A search conducted without a warrant does not offend the Constitution if conducted pursuant to the valid consent of a person in control of the premises." United States v. Kaplan, 895 F.2d 618, 622 (9th Cir. 1990). It is the government's burden to demonstrate that consent to a warrantless search was voluntary. Id. In Ohio v. Robinette, 519 U.S. 33 (1996), the Supreme Court held that a reviewing court is required to examine the totality of the circumstances in determining whether a defendant's consent to search following a stop for a traffic violation is voluntary. In that case, the police officer stopped the defendant for speeding and ran a computer check on the defendant's license, determining that Robinette had no previous convictions. The officer asked Robinette to step out of the car, issued a verbal warning, returned Robinette's license, and then asked him if he had any weapons, drugs, or other contraband in the car. Robinette answered that he did not, and the officer asked for permission to search the car. Robinette consented, and a search of the vehicle uncovered a small amount of marijuana. Robinette challenged the consent and search, asserting it was involuntary because he had not been told he was free to leave before he was asked to consent. The Supreme Court reaffirmed its prior decisions that a reviewing court is required to examine the totality of the circumstances in determining whether a defendant's consent is voluntary and that voluntariness is a question of fact to be determined from all of the circumstances. Id. at 40 (citation and internal quotation marks omitted).

Although Mercado does not directly challenge the voluntariness of Reyes' consent, his reply argues he was unlawfully detained because the officer should have issued Reyes a citation for speeding and allowed them to leave. He appears to argue Reyes' consent was tainted by their unlawful detention and anything recovered as a result of the search conducted pursuant to the consent must be suppressed under the "fruit of the poisonous tree" doctrine. The court has found that Reyes and Mercado were not detained any longer than reasonably necessary to effectuate the purpose of the initial stop. Once a

records check revealed that Reyes was driving on a suspended driver's license and that the vehicle was not registered to Reyes, Cargile asked for consent to search. Reyes consented verbally and in writing and did not revoke his consent at any time before the drugs were found. Reyes testified and did not dispute that his consent was voluntary or claim that he revoked or attempted to revoke his consent at any point during the encounter. As such, the evidence recovered during the consent search of the vehicle was not the product of any illegal police activity, and Mercado cannot show that the cocaine and money would not have been recovered from the vehicle "but for" Mercado's detention at the scene.

## CONCLUSION

The court found Officer Cargile credible that he stopped the VW Passat after pacing it doing eighty-two miles per hour in a posted seventy mile per hour zone. The police, therefore, had probable cause to conduct a traffic stop. The court also finds the collective knowledge available to investigators cooperating in this investigation amounted to at least reasonable suspicion to conduct an investigatory detention of the occupants of the VW Passat. Mercado's Fourth Amendment rights were not violated by the initial stop or its scope and duration. For all of the foregoing reasons,

**IT IS THE RECOMMENDATION** of the undersigned United States Magistrate Judge that Mercado's Motion to Suppress (Dkt. #69) be DENIED.

Dated this 27th day of April, 2009.

_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE